**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
 seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
 marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
 todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY BROWN, CHRISTINE WILEY, ROBERT BONKOWSKI and ITATY HERNANDEZ, individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>                              Plaintiffs,<br><br>     v.<br><br>FRITO-LAY NORTH AMERICA, INC. and PEPSICO, INC.,<br><br>                              Defendants. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY UNDER CALIFORNIA'S CONSTITUTION; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; UNJUST ENRICHMENT; AND TRESPASS TO CHATTELS<br><br>JURY TRIAL DEMANDED |

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................3

THE PARTIES .............................................................................................................5

JURISDICTION AND VENUE .....................................................................................5

SUBSTANTIVE ALLEGATIONS .................................................................................6

     A.    Defendants Programmed the Websites to Include Third-Party Resources that Utilize Cookie Trackers ...............................................................................6

     B.    Defendants Falsely Informed Users That They Could Reject the Websites' Use of Cookies .....................................................................................................10

     C.    The Private Communications Collected As a Result of Third Party Cookies Transmitted When Visiting Defendants' Websites. ..................................20

          1.    Google Cookies ...............................................................................20

          2.    Facebook Cookies ...........................................................................28

          3.    Twitter Cookies ...............................................................................33

          4.    Microsoft Clarity Cookies ..............................................................35

          5.    TikTok Cookies ...............................................................................37

          6.    SnapChat Cookies ...........................................................................40

     D.    The Private Communications Collected are Valuable. ........................41

PLAINTIFFS' EXPERIENCES ....................................................................................42

CLASS ALLEGATIONS .............................................................................................55

CAUSES OF ACTION .................................................................................................57

     First Cause of Action: Invasion of Privacy .........................................................57

     Second Cause of Action: Intrusion Upon Seclusion ...........................................60

     Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) ...............................................................62

     Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) .........................................66

     Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation ............68

     Sixth Cause of Action: Unjust Enrichment .........................................................71

     Seventh Cause of Action: Trespass to Chattels ..................................................72

CLASS ACTION COMPLAINT

Plaintiffs Mary Brown, Christine Wiley, Robert Bonkowski, and Itaty Hernandez ("Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against Frito-Lay North America, Inc. and PepsiCo, Inc. (collectively, "Defendants"). Plaintiffs' allegations against Defendants are based upon information and belief and upon investigation of counsel, except for allegations specifically pertaining to Plaintiffs, which are based upon Plaintiffs' personal knowledge.

## **INTRODUCTION**

1.      This Class Action Complaint concerns an egregious privacy violation and total breach of consumer trust in violation of California law. When consumers visit Defendants' websites (including, www.doritos.com; www.lays.com; www.cheetos.com; www.missvickies.com; www.roldgold.com; www.simplyfritolay.com; www.stacyssnacks.com; www.smartfood.com; www.powerade.com; and www.gatorade.com; each a "Website" and collectively the "Websites"), Defendants display to them a popup cookie consent banner. Defendants' cookie banner discloses that the Websites use cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendants assure visitors that they can choose to "change [their] cookie settings, [by] click[ing] 'Manage Cookie Preferences[,]'" as shown in the following example screenshot:



(Screenshot of the popup cookie consent banner zoomed in by 200% on the Doritos Website.)

2.      Like most internet websites, Defendants designed the Websites to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. However, unlike other websites, Defendants' Websites offer consumers a choice to browse without being tracked, followed, and targeted by third party data brokers and advertisers. But, Defendants' promises are outright lies, designed to lull users into

a false sense of security. Even after users elect to "Manage Cookie Preferences" and reject all non-required cookies, including "Functional Cookies" and "Advertising Cookies," Defendants surreptitiously cause third parties – including Google LLC (DoubleClick, Google Analytics, and YouTube), Meta Platforms, Inc. (Facebook), X Corp (Twitter), Microsoft Corporation (Microsoft Clarity), ByteDance Ltd. (TikTok), and Snap Inc. (SnapChat) (the "Third Parties") – to place and/or transmit cookies that track users' website browsing activities and eavesdrop on users' private communications on the Websites.

3.      Contrary to their express rejection of cookies and tracking technologies on the Websites, Defendants nonetheless caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These third-party cookies permitted the Third Parties to track and collect data in real time regarding visitors' behaviors and communications on the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

4.      The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

5.      This type of tracking and data sharing is exactly what the Websites' visitors who rejected all non-required cookies sought to avoid. Defendants falsely told the Websites' users that they respected their privacy and that they could avoid tracking and data sharing when they browsed the Websites. Despite receiving notice of consumers' express declination of consent, Defendants defied it and violated state statutes and tort duties.

**THE PARTIES**

6.     Plaintiff Mary Brown is, and was at all relevant times, an individual and resident of Concord, California. Plaintiff intends to remain in California and makes her permanent home there.

7.     Plaintiff Christine Wiley is, and was at all relevant times, an individual and resident of Long Beach, California. Plaintiff intends to remain in California and makes her permanent home there.

8.     Plaintiff Robert Bonkowski is, and was at all relevant times, an individual and resident of Cerritos, California. Plaintiff intends to remain in California and makes his permanent home there.

9.     Plaintiff Itaty Hernandez is, and was at all relevant times, an individual and resident of Cerritos, California. Plaintiff intends to remain in California and makes her permanent home there.

10.     Defendant Frito-Lay North America, Inc. is a Delaware corporation with its headquarters and principal place of business in Plano, Texas.

11.     Defendant PepsiCo, Inc. is a North Carolina corporation with its headquarters and principal place of business in Harrison, New York.

**JURISDICTION AND VENUE**

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendants are citizens of different states.

13.     The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendants within, affecting, and emanating from, the State of California. Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from products and services provided to persons in the State of California. Defendants have engaged, and continue to engage, in substantial and continuous business practices in the State of California.

14.     Defendants know and intend that California users visit the Websites. For example, in PepsiCo Inc.'s 2023 10-K SEC filing, PepsiCo acknowledged that it is subject to "data privacy and personal data protection laws and regulations, including the California Consumer Privacy Act of 2018 (as modified by the California Privacy Rights Act)."[1]

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

16.     Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

17.     Defendants' Websites have a Terms of Use that contains an arbitration provision and purports to apply to all Website users. Plaintiffs, however, did not assent to the Terms or the arbitration provision contained therein. An internet contract is valid only if the user takes some action to unambiguously manifest assent to the contract after the website has placed the user on actual notice of the terms of that contract or has put a reasonably prudent user on inquiry notice of those terms. Plaintiffs never saw the Terms, or even the hyperlink to "Terms & Conditions" at the bottom of the Websites, and thus had no actual notice that their continued browsing of the Websites would be subject to an arbitration agreement.

18.     Nor did the Websites place Plaintiffs on inquiry notice of the Terms because they failed to provide reasonably conspicuous notice of the Terms. Moreover, Plaintiffs took no action, such as clicking a button or checking a box, that unambiguously manifested their assent to the Terms. Instead, the Terms are only accessible through a link at the very bottom of the Websites. The Terms on the Websites are no more than unenforceable browsewrap agreements.

## SUBSTANTIVE ALLEGATIONS

**A.     Defendants Programmed the Websites to Include Third-Party Resources that Utilize Cookie Trackers.**

19.     Every website, including each of the Websites, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST"

---

[1] Available at https://www.sec.gov/Archives/edgar/data/77476/000007747624000008/pep-20231230.htm.

requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the any of the Websites, the user's browser sends a "GET" request to that Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address so that the Website server knows where to send the HTTP response.

20.    An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

21.    As a result, Defendants knew that the device or devices used by Plaintiffs and Class members to access the website were located in California.

22.    Defendants voluntarily integrated "third-party resources" from the Third Parties into their Websites' programming. "Third-party resources" refer to tools, content or services provided by third parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendants' use of the third-party resources on the Websites is done so pursuant to agreements between Defendants and those Third Parties.

23.    The Websites cause users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual

users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

24.     First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Websites' servers). First-party cookies are used to track users when they repeatedly visit the same website.

25.     A third-party cookie is set by a third-party domain/webserver (e.g., www.youtube.com; analytics.google.com; platform.twitter.com, etc.). When the user's browser loads a webpage (such as a webpage of any of the Websites) containing embedded third-party resources, the third parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Websites) and across multiple browsing sessions.

26.     As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Websites are transmitted to those third parties, enabling them to surreptitiously track in real time and collect users' personal information, such as their browsing activities and private communications with Defendants on the Websites, including the following:

•       **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

•       **Visit History**: Information about the frequency and total number of visits to the Website;

•       **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;

- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;

- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;

- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or

- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

27.    Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the

user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to boost website performance and revenue through the collection, utilization, and dissemination of user data.

28.     Defendants specialize in manufacturing and distributing snack food products and beverages, including brands such as Doritos tortilla chips, Lay's potato chips, Cheetos cheese-flavored snacks, and Powerade drinks, among many others. Defendants own and operate each of the Websites, which allow visitors to receive information about their products. As they interact with the Websites (e.g., by entering data into forms, clicking on links, and making selections), users communicate Private Communications to Defendants, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

29.     Defendants chose to install or integrate the Websites with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Websites, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendants incorporated into the Websites, or that Defendants caused to be loaded. Because Defendants control the software code of the Websites, and is capable of determining whether a user is accessing the Websites from California, they have complete control over whether first-party and third-party cookies are placed on their California users' devices and/or transmitted to third parties.

**B.     Defendants Falsely Informed Users That They Could Reject the Websites' Use of Cookies.**

30.     When Plaintiffs and other consumers in California visited the Websites, the Websites immediately displayed to them a popup cookie consent banner, which is identical for each of the Websites. As shown in the screenshot below, the cookie consent banner stated, "Your privacy is important to us[.] This website uses cookies so that we can provide you with the best user experience. To learn more and to change your cookie settings, click 'Manage

Cookie Preferences.' Otherwise, click 'Accept All Cookies' to continue." The banner then purported to provide users the opportunity to "Manage Cookies Preferences" by clicking or selecting the button to do so, as shown in the following screenshot from the Doritos Website:



Your privacy is important to us

This website uses cookies so that we can provide you with the best user experience. To learn more and to change your cookie settings, click "Manage Cookie Preferences." Otherwise, click "Accept All Cookies" to continue. Learn more about our use of your data by reading our Privacy Policy.

Accept All Cookies

Manage Cookie Preferences

(Screenshot of the popup cookie consent banner on the Doritos Website zoomed in by 200%.)

31.    Plaintiffs and other users who clicked or selected the "Manage Cookie Preferences" button were then directed to the Websites' cookies preferences window. There, Defendants further represented that users could "choose whether this site may use cookies or related technologies such as web beacons, pixel tags, and Flash objects ('Cookies') as described below" and presented users the option to choose either "NO" or "YES" with respect to all categories of cookies in use on the Websites, including "Functional Cookies" and "Advertising Cookies," other than those cookies "Required" for the operation of the Websites.

32.    Defendants defined and explained each category of cookies in use on the Websites on the cookies preferences window. Defendants defined "Functional Cookies" as those cookies that allow Defendants to "analyze your use of the site to evaluate and improve our performance…[and] to provide a better customer experience on the site."  Defendants defined "Advertising Cookies" as those cookies "used to show you ads that are more relevant to you[,]" which Defendants "may share…with advertisers[.]" Defendants defined "Required Cookies" as those cookies "necessary to enable the basic features of [the Websites] to function, such as providing secure log-in or remembering how far you are through an order" all of which is shown in the following screenshot:

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15  33.    Users who clicked or selected the "NO" option or setting for Functional and

16  Advertising cookies indicated their choice and/or agreement to decline or reject all cookies and

17  related tracking technologies in use on the Websites, except those cookies "Required" for basic

18  functionality of the Websites, which they could not reject. Users who clicked or selected the

19  "NO" option or setting for both Functional and Advertising cookies, and then selected or clicked

20  the "SUBMIT PREFERENCES" button, could then continue to browse the Websites, as the

21  popup cookie consent banner and cookies preferences window disappeared.

22  34.    Defendants' representations in the popup cookie consent banner and cookies

23  preference window led Plaintiffs, and all those users of the Websites similarly situated, to

24  believe that they declined or rejected all non-required cookies and tracking technologies,

25  especially those used to analyze users' use of the Websites, provide more relevant ads, and

26  share user information with advertisers. The banner and cookies preference window further

27  reasonably led Plaintiffs and those users of the Websites similarly situated to believe that

28  Defendants would not allow third parties, through cookies, to access their Private

Communications with the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Manage Cookie Preferences" button on the banner and selecting the "NO" option or setting for all categories of non-required cookies, including Functional and Advertising cookies, in the cookies preference window.

35.     Defendants' representations, however, were false. In truth, Defendants did not abide by Plaintiffs' or other users' wishes. When Plaintiffs' and other users clicked or selected the "Manage Cookies Preferences" button, then selected or clicked the "NO" option or setting for all categories of non-required cookies, including Functional and Advertising cookies, on the cookies preference window, they provided notice to Defendants that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Websites. Nevertheless, Defendants caused the Third-Party tracking cookies to be placed on the browsers and devices of the Websites' users and/or transmitted to the Third Parties along with user data.

36.     In particular, when users selected or clicked the "Manage Cookies Preferences" button, then selected or clicked the "NO" options or settings for Functional and Advertising cookies on the cookies preference window found on the Websites, Defendants nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by rejecting cookies, Defendants failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

CLASS ACTION COMPLAINT

1    37.    Some aspects of the operations of the Third Parties' cookies on the Websites can

2    be observed using specialized tools that log incoming and outgoing Website network

3    transmissions. The following screenshot, obtained using one such tool, shows examples of

4    Third-Party cookies being transmitted from a Doritos Website user's device and browser to

5    Third Parties even after the user selected or clicked the "Manage Cookies Preferences" button,

6    then selected or clicked the "NO" options or settings for all categories of non-required cookies,

7    including Functional and Advertising cookies, on the cookies preference window.



38.    Likewise, the following screenshot, obtained using the same developer tool,

shows examples of Third-Party cookies being transmitted from a Cheetos Website user's device

and browser to Third Parties even after the user selected or clicked the "Manage Cookies

Preferences" button, then selected or clicked the "NO" options or settings for all categories of

non-required cookies, including Functional and Advertising cookies, on the cookies preference

window.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13



14
15
16
17
18
19
20

39.     The following screenshots, obtained using the same developer tool, show examples of Third-Party cookies being transmitted from a Gatorade Website user's device and browser to Third Parties even after the user selected or clicked the "Manage Cookies Preferences" button, then selected or clicked the "NO" options or settings for all categories of non-required cookies, including Functional and Advertising cookies, on the cookies preference window.

21
22
23
24
25
26
27
28





40.     The following screenshot, obtained using the same developer tool, shows examples of Third-Party cookies being transmitted from a Lay's Website user's device and browser to Third Parties even after the user selected or clicked the "Manage Cookies Preferences" button, then selected or clicked the "NO" options or settings for all categories of non-required cookies, including Functional and Advertising cookies, on the cookies preference window.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

CLASS ACTION COMPLAINT

41.     The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendants' Website at https://www.doritos.com;   https://www.cheetos.com;   https://www.gatorade.com;   and https://www.lays.com, respectively. The screenshots depict only network traffic occurring *after* the user selected or clicked the "Manage Cookies Preferences" button, then selected or clicked the "NO" options or settings for Functional and Advertising cookies on the cookies preference window. As shown above, despite the user's rejection of all non-required cookies on the respective Websites, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like www.youtube.com; analytics.google.com; platform.twitter.com, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that the Websites, of which the Doritos and Cheetos Websites are typical, caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers declined or rejected

all such cookies and tracking technologies by clicking or selecting the "Manage Cookies Preferences" button, then clicking or selecting the "NO" options or settings for Functional and Advertising cookies on the cookies preference window. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's rejection of all such cookies.

42.      Plaintiffs' and other users' Private Communications with the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, are surreptitiously obtained by the Third Parties via these cookies.

43.      As users interact with the Websites, even after clicking or selecting the "Manage Cookies Preferences" button, then clicking or selecting the "NO" options or settings for Functional and Advertising cookies on the cookies preference window, thereby declining or rejecting the use of cookies and similar technologies for analytics and advertising functions, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendants wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Websites. Because third-party cookies cause Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits

and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

44.     The Third Parties' code that the Websites cause to be loaded and executed by the user's browser becomes a wiretap when it is executed because it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

**C.     The Private Communications Collected As a Result of Third Party Cookies Transmitted When Visiting Defendants' Websites.**

**1.     Google Cookies**

45.     Defendants caused third party cookies to be transmitted to and from users' browsers and devices on the Websites, even after users reject all non-required cookies (including Functional and Advertising cookies) to and from the **www.youtube.com**, **analytics.google.com**, and **doubleclick.net** domains. Each of these domains is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[2] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[3] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic

---

[2] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

[3] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies enable its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[4]

46.     Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[5] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

47.     Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[6] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when

---

[4] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).

[5] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

[6] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

CLASS ACTION COMPLAINT

someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[7]

48.    Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[8]

49.    For example, when a user visits the Doritos website, the Google software code that Defendants caused to be stored on and executed by the Website user's device causes the following type of data to be sent to Google's domain, at analytics.google.com:

---

[7] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

[8] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

CLASS ACTION COMPLAINT

| Request | Header | Query | Body | Cookies | Raw | Summary | + |

| Key | Value |
| --- | --- |
| _ee | 1 |
| _p | 193098881 |
| _s | 1 |
| cid | 903844911.1694061003 |
| dl | https://www.doritos.com/products |
| dr | https://www.doritos.com/about-us |
| dt | Products | Doritos |
| en | page_view |
| gtm | 45je38u0 |
| sct | 1 |
| seg | 1 |
| sid | 1694061003 |
| sr | 2240x1260 |
| tid | G-L4NYQ37HFM |
| uaa | arm |
| uab | 64 |
| uafvl | Chromium;116.0.5845.140|Not)A%3BBrand;24.0.0.0|Google%20Chrome;116.0.5845.140 |
| uam | |
| uamb | 0 |
| uap | macOS |
| uapv | 13.5.0 |
| uaw | 0 |
| ul | en-us |
| v | 2 |

50.     The "cid" parameter above refers to "Client ID." It contains a unique identifier for the user's browser and device, that enables Google to link the user to their interactions with the website.[9]

51.     The "dl" and "dr" parameters tell Google what webpages the user was viewing on the Website.

52.     The parameters beginning in "ua…" tell Google extensive information about the user's device and browser, including the specific operating system, browser brand, and device processor.

---

[9] *See, e.g.*, https://cheatography.com/dmpg-tom/cheat-sheets/google-universal-analytics-url-collect-parameters/; https://www.analyticsmarket.com/blog/how-google-analytics-collects-data/; https://www.owox.com/blog/use-cases/google-analytics-client-id/.

CLASS ACTION COMPLAINT

53.    In addition, Defendants' Website causes the "NID" cookie to be sent to Google, alongside the other data:

NID    511=acybQ7K99qSbFIJK2gsLHwlAmnUrgYAjakJoNOcHYgnqiM3W8Woy
GPpLLfUXGMkrX4PeljaHm8huDiNlDVp1nRj6oRt2tGsmuh9k-
xB4L5c9SFQnFNcPjhhDwrNcQLdZOkWRxRyPlbHKrVXyOB1CAY0huVSkjn
ekARNfgpE1NhL7oHlOhNQSiMcNqnGuG5ZEPNLeQb27p74wp1O5QPv5
MLCcHHchPV3XeUnOCmuFiSgF_FNtA5C8NIC8meR3D662V7A3JZpsSR
U85Q

54.    The "NID" cookie is also used for Google advertising. Specifically, it is used to show Google ads to users.[10]

55.    Finally, the data sent to Google contains the user's IP address.

56.    Defendants' other websites behave the same way. For example, the Cheetos Website causes the following type of data to be sent to Google:

---

[10] https://policies.google.com/technologies/cookies?hl=en-US

CLASS ACTION COMPLAINT

57.     The same is true of the Lays Website:

CLASS ACTION COMPLAINT

58.    Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie causes Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared

**CLASS ACTION COMPLAINT**

traits (such as females, Millennials, Californians, etc.), and to perform targeted advertising and marketing analytics.

59.     Thus, the Google cookies used on the Website cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[11]

60.     Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[12] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

---

[11] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).

[12] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

2.      **Facebook Cookies**

61.      Defendants cause third party cookies to be transmitted to and from Website users' browsers and devices to and from the **facebook.com** domain, even after users elect to reject all cookies (including Functional and Advertising cookies). This domain is associated with Meta's digital advertising and analytics platform that collects user information via cookies to assist Meta in performing data collection, behavioral analysis, user retargeting, and analytics.[13] Meta serves targeted ads to web users across Meta's ad network, which spans millions of websites and apps.

62.      The facebook.com cookies help Meta track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance.

63.      For example, the Doritos Website inexplicably caused the following data to be sent to Meta when users attempted to reject Meta's cookies using the Website:



| Key | Value |
|---|---|
| id | 384245912404524 |
| ev | SubscribedButtonClick |
| dl | https%3A%2F%2Fwww.doritos.com%2F |
| rl | https%3A%2F%2Fwww.doritos.com%2F |
| if | false |
| ts | 1755236749685 |
| cd[buttonFeatures] | %7B"classList"%3A"cmp-save-btn"%2C"destination"%3A""%2C"id"%3A""%2C"imageUrl"%3A""%2C"innerText"%3A"Save%20Changes"%2C"numChildButtons"%3A0%2C"tag"%3A"button"%2C"type"%3A"button"%2C"name"%3A""%2C"value"%3A""%7D |

---

[13] https://www.facebook.com/privacy/policies/cookies/.

**CLASS ACTION COMPLAINT**

| | |
|---|---|
| cd[buttonText] | Save%20Changes |
| cd[formFeatures] | %5B%5D |
| cd[pageFeatures] | %7B"title"%3A"Home%20%7C%20Doritos"%7D |
| sw | 1512 |
| sh | 982 |
| v | 2.9.224 |
| r | stable |
| ec | 2 |
| o | 12318 |
| fbp | fb.1.1755236699643.56986462656115707 |
| cdl | API_unavailable |
| plt | 139.20000004768372 |
| it | 1755236699577 |
| coo | false |
| es | automatic |
| tm | 3 |
| exp | u2 |
| rqm | FGET |

64.    Along with this data, the Website caused the following kinds of cookie data to be sent to Meta:



1
2
3
4
5
6
7
8

65.    The c_user cookie shown above causes Facebook to identify a specific user when they are logged in to their account. The c_user cookie stores a user's unique ID, which is associated with their Facebook profile. This ID enables Facebook to track user interactions on its platform and across sites that use Facebook plugins, such as adding items to a cart, clicking "Like" buttons, or engaging with comment sections. When combined with other data sent to the Facebook domain, this cookie allows Meta to track users' browsing activities. Facebook uses this data for various purposes, such as personalizing content, enhancing ad targeting accuracy, and refining its user experience.

9
10
11
12

66.    The same is true of the Gatorade Website. Even after users reject Meta cookies, the site continues to send cookies and other data to Meta. For example, after the user rejected cookies and then browsed to the Gatorade "Back to School" webpage, the Website caused the following data to be sent to Meta:

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CLASS ACTION COMPLAINT

| Key | Value |
| --- | --- |
| id | 381827169039504 |
| ev | PageView |
| dl | https%3A%2F%2Fwww.gatorade.com%2Fback-to-school |
| rl | https%3A%2F%2Fwww.google.com%2F |
| if | false |
| ts | 1755237067492 |
| cd[breakpoint] | sm |
| cd[content_group] | product%20list |
| cd[content_type] | (not%20set) |
| cd[page_location] | https%3A%2F%2Fwww.gatorade.com%2Fback-to-school |
| cd[page_path] | %2Fback-to-school |
| cd[page_referrer] | https%3A%2F%2Fwww.gatorade.com%2F |
| cd[page_title] | school%20water%20bottles%2C%20pods%20%26%20more%20%7C%20gatorade%20%7C%20gatorade%20official%20site |
| cd[tracker_consent] | "3"%3A1%2C"2"%3A1%2C"1"%3A1%2C"4"%3A1 |
| cd[visitor_type] | anonymous |
| cd[user_properties] | %7B%7D |
| sw | 1512 |
| sh | 982 |
| v | 2.9.224 |
| r | stable |
| a | tmSimo-GTM-WebTemplate |
| ec | 1 |
| o | 12317 |
| fbp | fb.1.1755237017259.577387054302916770 |
| ler | other |
| cdl | API_unavailable |
| plt | 630.2999999523163 |
| it | 1755237017194 |
| coo | false |
| tm | 1 |
| exp | r0 |
| rqm | FGET |

CLASS ACTION COMPLAINT

67.     Further, the Gatorade Website caused cookie data to be sent to Meta alongside the above data:



68.     By identifying users who have shown interest in certain products or content, the facebook.com cookies cause Meta's advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Meta's ad network.[14] These cookies allow Meta to collect data on how users interact with websites, regardless of whether they have a Facebook account or are logged in.[15]

69.     The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and/or (xii) geolocation data (including IP addresses).[16]

---

[14] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect

[15] https://allaboutcookies.org/what-data-does-facebook-collect.

[16] *Id.*

- 32 -

CLASS ACTION COMPLAINT

70.    Meta utilizes the data collected through the facebook.com cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as (i) **Ad Targeting and Retargeting**, in which Meta uses the facebook.com cookie to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. This profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) **Conversion Tracking**, in which Meta uses the facebook.com cookie to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter; (iii) **Audience Insights and Analytics**, in which Meta uses the facebook.com cookie to provide data to businesses on user demographics (such as Millennials, Californians, etc.), interests, and behaviors across their sites and apps; and (iv) **Cross-Device and Cross-Platform Tracking**, in which Meta uses the facebook.com cookie  to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

### 3.    Twitter Cookies

71.    Defendants also caused third party cookies to be transmitted to and from users' browsers and devices on the Websites, even after users reject all non-required cookies (including Functional and Advertising cookies) to and from the twitter.com domains and its subdomains. Each of these domains is associated with X Corp, formerly known as Twitter. X Corp's cookies collect a wide range of user data, including a user's browsing history; IP address; interactions with advertisements; data used to authenticate and secure personal accounts; and reading a device's local storage.[17] X Corp uses the collected user data to target users with personalized advertisements and content, generate analytics on website interaction, and to conduct unspecified "Research and Development."[18]

---

[17] *See* https://help.x.com/en/rules-and-policies/x-cookies.

[18] *Id.*

CLASS ACTION COMPLAINT

72.    For example, when a user visits the Doritos website, the Google software code that Defendants caused to be stored on and executed by the Website user's device causes the following cookie data to be sent to X's domain, at syndication.twitter.com:



According to X documentation, the "personalization_id" cookie "tracks activities on and off Twitter for a personalized experience."[19] The "guest_id_marketing" and "guest_id_ads" cookies are "for advertising when logged out."[20] The "personalization_id" cookie "tracks activities on and off Twitter for a personalized experience."[21]

73.    The same type of data is also sent to Twitter/X when users visit the Lays website:



74.    Twitter also receives extensive "user-agent" information, revealing the user's operating system, device type, and browser.

---

[19] https://help.x.com/en/rules-and-policies/x-cookies

[20] *Id.*

[21] *Id.*

CLASS ACTION COMPLAINT

75.     This data allows X Corp to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data.

### 4.    Microsoft Clarity Cookies

76.     Defendants' Gatorade Website also caused third party cookies to be transmitted to and from users' browsers and devices on the Websites, even after users reject all non-required cookies (including Functional and Advertising cookies) to and from the **clarity.ms** domain. This domain is associated with Clarity, Microsoft's "cutting-edge behavioral analytics tool that helps you understand user interaction with your website or app".[22] Clarity is a Microsoft Advertising tool, which "crucial for successful marketing."[23] "Clarity's tracking code … uses a cookie to obtain user session data." [24]

77.     Clarity allows Defendant to "watch live users in action" via "recordings of live user interactions" on the website, including a user's "clicks or taps, scrolling, navigation, and more."[25] Indeed, Clarity boasts that it "tracks all visitor clicks and scrolls on mobile, desktop,



---

[22] https://learn.microsoft.com/en-us/clarity/setup-and-installation/about-clarity.

[23] https://about.ads.microsoft.com/en/blog/post/october-2021/introducing-microsoft-clarity-insights-for-microsoft-advertising.

[24] https://learn.microsoft.com/en-us/clarity/setup-and-installation/cookie-consent.

[25] https://clarity.microsoft.com/session-recordings.

CLASS ACTION COMPLAINT

and tablet[.]" These "session recordings" track each and every consumer's individual actions on the website.[26]

78.    Further, Clarity permits Defendant to aggregate individual users' session recordings into "heatmaps" for Defendant's financial gain. Heatmaps  are "visualization tool[s]" aimed at "aggregat[ing] information about how users interact with the website." [27] This allows Defendant to "See at a glance which areas on [web site owner's] page drive the most engagement," a crucial element to increasing advertising revenue. [28] Clarity also permits Defendant to "track a specific subset of users," including tracking metrics like what browser users visited from, what type of device, the date, and more. Clarity even permits the use of specific "Clarity user ID[s]" which permits Clarity to track users across their devices, and identify when the same user visits multiple times to the website.[29] Businesses use Clarity to "make data-driven decisions" to "improve overall conversion rates" of clicks, engagement, or sales.[30] Microsoft notes in a Clarity case study that Clarity cookies permitted businesses to see a "substantial increase" in "purchases." [31] In one instance, "following just five days after implementing Clarity, the [business] saw an uplift of 19% in conversion rate."[32] Businesses consider Clarity a "must-have tool for any business serious about optimizing their website and increasing online revenue."[33]

---

[26] https://clarity.microsoft.com/session-recordings.

[27] https://learn.microsoft.com/en-us/clarity/heatmaps/heatmaps-overview.

[28] https://clarity.microsoft.com/heatmaps.

[29] https://clarity.microsoft.com/insights; https://learn.microsoft.com/en-us/clarity/setup-and-installation/identify-api.

[30] https://clarity.microsoft.com/case-studies/ecommerce-boost/#:~:text=Using%20Clarity&text=By%20analyzing%20user%20sessions%20and,and%20improve%20overall%20conversion%20rates.

[31] *Id.*

[32] *Id.*, emphasis in original.

[33] https://clarity.microsoft.com/case-studies/ecommerce-boost/#:~:text=Using%20Clarity&text=By%20analyzing%20user%20sessions%20and,and%20improve%20overall%20conversion%20rates.

CLASS ACTION COMPLAINT

79.     The specific cookie sent to Clarity from the User's browser is the "MUID" cookie:



According to Microsoft's documentation, the "MUID" cookie "[i]dentifies unique web browsers visiting Microsoft sites [and is] used for advertising, site analytics, and other operational purposes."[34]

80.     Microsoft collects data from Clarity,[35] which "Microsoft retains . . . for as long as necessary[.]"[36]  Clarity cookies allow Microsoft to obtain and store at least the following user data: (i) user identifier; (ii) website interactions; (iii) interests and preferences; (iv) shopping behavior; (v) device information; (vi) demographic data; (vii) geolocation data; (viii) referring URL; and (ix) session information.[37]

### 5.    TikTok Cookies

81.     Defendants also caused third party cookies to be transmitted to and from users' browsers and devices on at least the Gatorade Website, even after users reject all non-required cookies (including Functional and Advertising cookies) to and from the **analytics.tiktok.com** domain. This domain is associated with TikTok for Business, a suite of tools offered by TikTok, a social media platform owned by ByteDance Ltd., known for short-form video sharing.[38] The TikTok platform is used to create and share videos, and it utilizes cookies for various purposes

---

[34]  https://learn.microsoft.com/en-us/clarity/setup-and-installation/cookie-list

[35] https://www.microsoft.com/en-us/privacy/privacystatement.

[36] *Id.*

[37] https://learn.microsoft.com/en-us/clarity/setup-and-installation/clarity-data.

[38] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

CLASS ACTION COMPLAINT

1    including assisting brands and marketers to create, manage, and optimize ad campaigns on the

2    platform.[39]

3        82.    TikTok utilizes analytics.tiktok.com cookies to collect data on user interactions

4    with websites that have integrated TikTok's tracking technologies (such as the Website). These

5    cookies are used to "measure and improve the performance of your advertising campaigns and to

6    personalize the user's experience (including ads) on TikTok."[40] TikTok further explains that it

7    uses cookies to "match events with people who engage with your content on TikTok. Matched

8    events are used to improve measurement and optimize ad campaigns. They can also contribute to

9    building your retargeting and engagement audiences." *Id.* These cookies enable TikTok to

10    recognize and track users across different sessions and domains (i.e., cross-site tracking) and to

11    collect and synchronize user data to observe and evaluate TikTok user behavior.

12        83.    These cookies enable TikTok to obtain and store at least the following user data:

13    (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, including

14    *email addresses and phone numbers*; (v) demographic information, (vi) interests and preferences,

15    (vii) shopping behaviors, (viii) device information, (ix) session information, (x) user identifiers,

16    and (xi) geolocation data in the form of the IP address.[41]

17        84.    For example, the TikTok software code that Defendants cause to be stored on and

18    executed by the Gatorade Website user's device causes the following data to be sent to TikTok's

19    domain, at analytics.tiktok.com:

20

21

22

---

23    [39] *See, e.g.*, TikTok for Business (https://ads.tiktok.com/business/en-US/products/ads; and
    https://ads.tiktok.com/business/en-US/products/measurement); TikTok Business Help Center; Using Cookies
24    with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

25    [40] TikTok Business Help Center; Using Cookies with TikTok Pixel (available at
    https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).
26    [41] *Id.*; *see also* TikTok for Business: Enhance Data Postback with the TikTok Pixel
    (https://ads.tiktok.com/help/article/enhance-data-postback-with-the-tiktok-pixel?lang=en); TikTok for Business:
27    Advanced Matching for Web (available at https://ads.tiktok.com/help/article/advanced-matching-
    web?redirected=1); TikTok for Business: About TikTok Pixel (available at
28    https://ads.tiktok.com/help/article/tiktok-pixel?lang=en).

CLASS ACTION COMPLAINT

▼ Request Payload    View source
▼{event: "ViewContent", event_id: "1754872395612_1754872110529331",…}
  ▼ context: {ad: {sdk_env: "external", jsb_status: 2}, device: {platform: "pc"},…}
    ▶ ad: {sdk_env: "external", jsb_status: 2}
      csct: 1
      csid: "1754871435987::8Cf0jJ45pc4D8m3dMGr0"
    ▼ device: {platform: "pc"}
        platform: "pc"
    ▼ library: {name: "pixel.js", version: "2.2.1"}
        name: "pixel.js"
        version: "2.2.1"
    ▼ page: {url: "https://www.gatorade.com/bottles/overtime-bottle-screw-cap/graphite-00052000064063",…}
        load_progress: "2"
        referrer: "https://www.gatorade.com/"
        url: "https://www.gatorade.com/bottles/overtime-bottle-screw-cap/graphite-00052000064063"
      page_csid: "1754871435987::4fUaDI1EfC1j_bdf4WCt"
      pageview_id: "7e596b38-7648-11f0-8c24-762d7139b488-1n23Y.0.1::7e593d2a-7648-11f0-8c24-762d7139b488-CBDDC7BC77U9N02IJI80"
    ▼ pixel: {code: "CBDDC7BC77U9N02IJI80", runtime: "1"}
        code: "CBDDC7BC77U9N02IJI80"
        runtime: "1"
      session_id: "7e596b38-7648-11f0-8c24-762d7139b488::PHBGoxlIuenqnvpHp9Fu-CBDDC7BC77U9N02IJI80"
    ▼ user: {anonymous_id: "01K2B7T4PJEHZ1MD3YDXJ9DTDG_.tt.1"}
        anonymous_id: "01K2B7T4PJEHZ1MD3YDXJ9DTDG_.tt.1"
      userAgent: "Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/138.0.0.0 Safari/537.36"
      variation_id: "default"
  event: "ViewContent"
  event_id: "1754872395612_1754872110529331"
  is_onsite: false
  message_id: "1754871481956-8657457506737-CBDDC7BC77U9N02IJI80"
  ▼ properties: {gtm_version: "0_2_01:13", event_trigger_source: "GoogleTagManagerClient",…}
    ▶ contents: [{brand: "gatorade", content_category: "bottles", content_id: "00052000064063",…}]
      currency: "USD"
      event_trigger_source: "GoogleTagManagerClient"
      gtm_version: "0_2_01:13"
      value: 39.99
  ▶ signal_diagnostic_labels: {raw_email: {label: "missing"}, raw_auto_email: {label: "missing"}, raw_phone: {label: "missing"},…}
  timestamp: "2025-08-11T00:18:01.956Z"
  ▶ _inspection: {ppf: [{id: 10, d: 1100}, {id: 12, d: 0}, {id: 10, d: 500}, {id: 12, d: 0}, {id: 5, d: 0}],…}

85.    The data includes the "session_id," which is a unique identifier generated by TikTok to track a user's activity. This allows TikTok to correlate the user's behavior from a browsing session, including page views and conversions, to a particular user to enhance advertising measurement, attribution, and targeting.[42]

86.    Alongside this data, the following cookie data is sent to TikTok:

✕   Headers   Payload   Preview   Response   Initiator   Timing   **Cookies**

**Request Cookies**    ☐ show filtered out request cookies

| Name | Value | Domain |
|------|-------|--------|
| _ttp | 2vQi5sJg4RrC9hoMxHMaKraWDlt | .tiktok.com |
| ttwid | 1%7CPQ7NwbqTkuXYcf0huNzj9WbO2ZnfSMpZRJlcyHu... | .tiktok.com |

---

[42] *See, e.g.*, How to get TikTok session id? (available at https://gbtimes.com/how-to-get-tiktok-session-id/

CLASS ACTION COMPLAINT

87.    According to TikTok's documentation, the "_ttp" cookie is one of the company's advertising cookies, the purpose of which is "[t]o measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[43]

88.    Finally, the data sent to TikTok includes the user's IP address.

89.    According to TikTok's documentation, "[t]he 'ttwid' first-party cookie is for analytics and web optimisation."[44]

90.    By collecting this user data, TikTok performs user behavior tracking, i.e., monitoring user actions like page views, clicks, and interactions to understand user engagement; advertising optimization, i.e., gathering data to enhance the relevance and effectiveness of TikTok advertising campaigns; and performance measurement (i.e., assessing the success of marketing efforts by analyze user responses to ads and content).[45]

91.    Further, TikTok's Automatic Advanced Matching feature functions as follows: "When a visitor lands on your website and inputs customer information during registration, sign-in, contact, or checkout on a website where you installed your pixel, Automatic Advanced Matching will capture information from those fields. …TikTok will use hashed information to link event information to people on TikTok. TikTok may use matched events to better attribute events to TikTok ads, optimize advertisers' future campaigns, and depending on advertisers' and users' settings, TikTok may also add people to advertisers' retargeting or engagement audiences."[46]

**6.    SnapChat Cookies**

92.    Defendants also caused third party cookies to be transmitted to and from users' browsers and devices on the Websites, even after users reject all non-required cookies (including

---

[43] *See* TikTok for Business: Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[44] https://www.tiktok.com/legal/page/global/tiktok-website-cookies-policy/en

[45] *See* TikTok for Business: Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[46] TikTok for Business: How to set up Automatic Advanced Matching (available at https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en).

CLASS ACTION COMPLAINT

Functional and Advertising cookies) to and from the subdomain **tr.snapchat.com**, which is associated with Snap Inc. (SnapChat), a social media company that uses its cookies to measure users' conduct across distinct websites to help advertisers target ads. [47] SnapChat uses tr.snapchat.com cookies to collect data on browsing history, choices, and interactions with advertisements.[48] This data helps Snapchat personalize ad content and track users across the internet.[49]

### D.    **The Private Communications Collected are Valuable.**

93.    As part of its regular course of business, Defendants target California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendants' and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendants cause to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendants knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

94.    The Private Communications that the Third Parties track and collect by way of the cookies on the Website are valuable to Defendants as well as the Third Parties. Defendants can use the data to create and analyze the performance of marketing campaigns, website design, product placement, and target specific users or groups of users for advertisements. For instance, if Defendants wanted to market certain of their snack food and beverage products to consumers in California, Defendants could use the data collected by the Third Parties to monitor the users who visit webpages related to specific products, know their location, and then advertise similar products to those particular users when they visit other webpages. The third-party cookies also enable Defendants to target online advertisements to users when they visit *other* websites, even those completely unrelated to Defendants and their products.

---

[47] *See* https://snapdiscoveries.com/what-is-tr-snapchat-com-is-used-for.

[48] *Id.*

[49] *Id.*

95.     Data about users' browsing history enables Defendants to spot patterns in users' behavior on the Websites and their interests in, among other things, Defendants' snack food and beverage products. On a broader scale, it enables Defendants to gain an understanding of trends happening across their brands and across the snack food and beverage markets. All of this helps Defendants further monetize the Websites and maximize revenue by collecting and analyzing user data.

96.     The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[50] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

97.     Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

98.     Through their false representations and aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to track users' Private Communications on the Website using third-party cookies, Defendants are unjustly enriching themselves at the cost of consumer privacy and choice, when the consumer could otherwise have the ability to choose if and how they would monetize their data.

**PLAINTIFFS' EXPERIENCES**

**Mary Brown**

99.     Plaintiff Brown visited the lays.com Website to browse information about Defendants' products on one or more occasions during the last four years. Ms. Brown's visits to the Website were consistent with a typical Website user's visits seeking information about

---

[50] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

Lays chips. Specifically, Plaintiff Brown is not a consumer advocate, a "tester," or a compliance auditor that visited Defendant's website to test or evaluate Defendant's privacy practices. Plaintiff Brown input data on the website form in searching for where to purchase Defendants' products.

100.    When Plaintiff Brown visited the Lay's Website, the Website immediately presented her with Defendants' popup cookie consent banner, which provided the option to click or select the "Manage Cookie Preferences" button. Plaintiff Brown viewed Defendants' representation on the popup cookie consent banner that, "Your privacy is important to us[.] This website uses cookies so that we can provide you with the best user experience. To learn more and to change your cookie settings, click 'Manage Cookie Preferences.'"

101.    Consistent with her typical practice in managing her website cookie preferences to reject or otherwise decline the placement or use of cookies and tracking technologies, Plaintiff Brown selected and clicked the "Manage Cookie Preferences" button. Clicking this button directed Plaintiff Brown to the cookies preference window, where Plaintiff Brown viewed Defendants' further representation and invitation to "choose whether this site may use cookies or related technologies such as web beacons, pixel tags, and flash objects ('Cookies') as described below." Plaintiff Brown also viewed Defendants' description of each category of Required Cookies, Functional Cookies, and Advertising Cookies. Desiring to reject or decline all cookies, or at least as many cookies as possible, especially those used for analytics and advertising, Plaintiff Brown selected or clicked the "NO" option or setting for all categories of cookies for which she could do so, including Functional Cookies and Advertising Cookies. The only category of cookies she could not reject or decline were "Required Cookies…necessary to enable the basic features of this site to function[.]"

102.    Plaintiff Brown believed that selecting the "NO" option or setting for all categories of cookies, except Required Cookies, on the cookies preference window found on the Website would allow her to opt out of, decline, and/or reject all non-required cookies and other tracking technologies (inclusive of those cookies that performed analytics and advertising

functions). Plaintiff Brown then clicked or selected the "SUBMIT PREFERENCES" button to notify Defendants of her choices.

103.    In rejecting all non-required cookies in the cookies preference window, Plaintiff Brown gave Defendants notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Brown specifically rejected, based on Defendants' representations, those cookies used to "analyze your use of the site" and "share this information with advertisers or use it to better understand your interests." In reliance on these representations and promises, only then did Plaintiff Brown continue browsing the Website.

104.    Even before the popup cookie consent banner appeared on the screen, Defendants nonetheless caused cookies and tracking technologies, including those used for functional and advertising purposes, to be placed on Plaintiff Brown's device and/or transmitted to the Third Parties along with user data, without Plaintiff Brown's knowledge. Accordingly, Defendants' representations made on the popup cookie consent banner and cookies preference window to Plaintiff Brown, that she could reject the use and/or placement of all non-required cookies and tracking technologies while she browsed the Website, were false. Contrary to what Defendants made Plaintiff Brown believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendants had already caused that to happen.

105.    Then, as Plaintiff Brown continued to browse the Website in reliance on the promises Defendants made in the cookie consent banner, and despite Plaintiff Brown's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendants nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing analytics and advertising functions from the Third Parties on her device. In doing so, Defendants permitted the Third Parties to track and collect Plaintiff Brown's Private Communications as Plaintiff Brown browsed the Website.

1       106.    Defendants' representations that consumers could "choose" which cookies and

2   related tracking technologies would be used while Plaintiff Brown and users browsed the

3   Websites were untrue. Had Plaintiff Brown known this fact, she would not have used the

4   Websites. Moreover, Plaintiff Brown reviewed the popup cookie consent banner and cookies

5   preference window prior to using the Website. Had Defendants disclosed that they would

6   continue to cause cookies and tracking technologies to be stored on consumers' devices even

7   after they choose to reject all non-required cookies, Plaintiff Brown would have noticed it and

8   would not have used the Website or, at a minimum, she would have interacted with the Website

9   differently.

10      107.    Plaintiff Brown continues to desire to browse content featured on the Websites.

11  Plaintiff Brown would like to browse websites that do not misrepresent that users can reject all

12  non-required cookies and tracking technologies. If the Websites were programmed to honor

13  users' requests to reject all non-required cookies and tracking technologies, Plaintiff Brown

14  would likely browse the Websites again in the future, but will not do so until then. Plaintiff

15  Brown regularly visits websites that feature content similar to that of the Websites. Because

16  Plaintiff Brown does not know how the Websites are programmed, which can change over time,

17  and because she does not have the technical knowledge necessary to test whether the Websites

18  honor users' requests to reject all non-required cookies and tracking technologies, Plaintiff

19  Brown will be unable to rely on Defendants' representation when browsing the Websites in the

20  future absent an injunction that prohibits Defendants from making misrepresentations on the

21  Websites. The only way to determine what network traffic is sent to third parties when visiting

22  a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests,

23  such tools are designed for use by "developers" (i.e., software developers), whose specialized

24  training enables them to analyze the data underlying the HTTP traffic to determine what data,

25  if any, is being sent to whom. Plaintiff Brown is not a software developer and has not received

26  training with respect to HTTP network calls.

27  **<u>Christine Wiley</u>**

28

1    108.    Plaintiff Wiley visited each of the doritos.com, lays.com and missvickies.com
2    Websites to browse information about Defendants' products on one or more occasions during
3    the last four years. Plaintiff Wiley's visits to the Website were consistent with a typical Website
4    user's visits seeking information about Doritos chips. Specifically, Plaintiff Wiley is not a
5    consumer advocate, a "tester," or a compliance auditor that visited Defendant's website to test
6    or evaluate Defendant's privacy practices.

7    109.    When Plaintiff Wiley visited these Websites, the Websites immediately
8    presented her with Defendants' popup cookie consent banner, which provided the option to
9    click or select the "Manage Cookie Preferences" button. Plaintiff Wiley viewed Defendants'
10   representation on the popup cookie consent banner that, "Your privacy is important to us[.] This
11   website uses cookies so that we can provide you with the best user experience. To learn more
12   and to change your cookie settings, click 'Manage Cookie Preferences.'"

13   110.    Consistent with her typical practice in managing her website cookie preferences
14   to reject or otherwise decline the placement or use of cookies and tracking technologies,
15   Plaintiff Wiley selected and clicked the "Manage Cookie Preferences" button. Clicking this
16   button directed Plaintiff Wiley to the cookies preference window, where Plaintiff Wiley viewed
17   Defendants' further representation and invitation to "choose whether this site may use cookies
18   or related technologies such as web beacons, pixel tags, and flash objects ('Cookies') as
19   described below." Plaintiff Wiley also viewed Defendants' description of each category of
20   Required Cookies, Functional Cookies, and Advertising Cookies. Desiring to reject or decline
21   all cookies, or at least as many cookies as possible, especially those used for analytics and
22   advertising, Plaintiff Wiley selected or clicked the "NO" option or setting for all categories of
23   cookies for which she could do so, including Functional Cookies and Advertising Cookies. The
24   only category of cookies she could not reject or decline were "Required Cookies…necessary to
25   enable the basic features of this site to function[.]"

26   111.    Plaintiff Wiley believed that selecting the "NO" option or setting for all
27   categories of cookies, except Required Cookies, on the cookies preference window found on
28

CLASS ACTION COMPLAINT

the Websites would allow her to opt out of, decline, and/or reject all non-required cookies and other tracking technologies (inclusive of those cookies that performed analytics and advertising functions). Plaintiff Wiley then clicked or selected the "SUBMIT PREFERENCES" button to notify Defendants of her choices.

112.    In rejecting all non-required cookies in the cookies preference window, Plaintiff Wiley gave Defendants notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Websites. Further, Plaintiff Wiley specifically rejected, based on Defendants' representations, those cookies used to "analyze your use of the site" and "share this information with advertisers or use it to better understand your interests." In reliance on these representations and promises, only then did Plaintiff Wiley continue browsing the Websites.

113.    Even before the popup cookie consent banner appeared on the screen, Defendants nonetheless caused cookies and tracking technologies, including those used for functional and advertising purposes, to be placed on Plaintiff Wiley's device and/or transmitted to the Third Parties along with user data, without Plaintiff Wiley's knowledge. Accordingly, Defendants' representations made on the popup cookie consent banner and cookies preference window to Plaintiff Wiley, that she could reject the use and/or placement of all non-required cookies and tracking technologies while she browsed the Websites, were false. Contrary to what Defendants made Plaintiff Wiley believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendants had already caused that to happen.

114.    Then, as Plaintiff Wiley continued to browse the Websites in reliance on the promises Defendants made in the cookie consent banner, and despite Plaintiff Wiley's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendants nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing analytics and advertising functions from the Third

CLASS ACTION COMPLAINT

Parties on her device. In doing so, Defendants permitted the Third Parties to track and collect Plaintiff Wiley's Private Communications as Plaintiff Wiley browsed the Websites.

115.    Defendants' representations that consumers could "choose" which cookies and related tracking technologies would be used while Plaintiff Wiley and users browsed the Websites were untrue. Had Plaintiff Wiley known this fact, she would not have used the Websites. Moreover, Plaintiff Wiley reviewed the popup cookie consent banner and cookies preference window prior to using the Websites. Had Defendants disclosed that they would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all non-required cookies, Plaintiff Wiley would have noticed it and would not have used the Websites or, at a minimum, she would have interacted with the Websites differently.

116.    Plaintiff Wiley continues to desire to browse content featured on the Websites. Plaintiff Wiley would like to browse websites that do not misrepresent that users can reject all non-required cookies and tracking technologies. If the Websites were programmed to honor users' requests to reject all non-required cookies and tracking technologies, Plaintiff Wiley would likely browse the Websites again in the future, but will not do so until then. Plaintiff Wiley regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Wiley does not know how the Websites are programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Websites honor users' requests to reject all non-required cookies and tracking technologies, Plaintiff Wiley will be unable to rely on Defendants' representation when browsing the Websites in the future absent an injunction that prohibits Defendants from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data,

CLASS ACTION COMPLAINT

if any, is being sent to whom. Plaintiff Wiley is not a software developer and has not received training with respect to HTTP network calls.

**Robert Bonkowski**

117.    Plaintiff Bonkowski visited the cheetos.com Website to browse information about Defendants' products on one or more occasions during the last four years. Plaintiff Bonkowski's visits to the Website were consistent with a typical Website user's visits seeking information about Cheetos chips. Specifically, Plaintiff Bonkowski is not a consumer advocate, a "tester," or a compliance auditor that visited Defendant's website to test or evaluate Defendant's privacy practices.  Plaintiff Bonkowski input search queries on the Website.

118.    When Plaintiff Bonkowski visited these Websites, the Websites immediately presented him with Defendants' popup cookie consent banner, which provided the option to click or select the "Manage Cookie Preferences" button. Plaintiff Bonkowski viewed Defendants' representation on the popup cookie consent banner that, "Your privacy is important to us[.] This website uses cookies so that we can provide you with the best user experience. To learn more and to change your cookie settings, click 'Manage Cookie Preferences.'"

119.    Consistent with his typical practice in managing his website cookie preferences to reject or otherwise decline the placement or use of cookies and tracking technologies, Plaintiff Bonkowski selected and clicked the "Manage Cookie Preferences" button. Clicking this button directed Plaintiff Bonkowski to the cookies preference window, where Plaintiff Bonkowski viewed Defendants' further representations and invitation to "choose whether this site may use cookies or related technologies such as web beacons, pixel tags, and flash objects ('Cookies') as described below." Plaintiff Bonkowski also viewed Defendants' description of each category of Required Cookies, Functional Cookies, and Advertising Cookies. Desiring to reject or decline all cookies, or at least as many cookies as possible, especially those used for analytics and advertising, Plaintiff Bonkowski selected or clicked the "NO" option or setting for all categories of cookies for which he could do so, including Functional Cookies and

Advertising Cookies. The only category of cookies he could not reject or decline were "Required Cookies…necessary to enable the basic features of this site to function[.]"

120.    Plaintiff Bonkowski believed that selecting the "NO" option or setting for all categories of cookies, except Required Cookies, on the cookies preference window found on the Websites would allow him to opt out of, decline, and/or reject all non-required cookies and other tracking technologies (inclusive of those cookies that performed analytics and advertising functions). Plaintiff Bonkowski then clicked or selected the "SUBMIT PREFERENCES" button to notify Defendants of his choices.

121.    In rejecting all non-required cookies in the cookies preference window, Plaintiff Bonkowski gave Defendants notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Websites. Further, Plaintiff Bonkowski specifically rejected, based on Defendants' representations, those cookies used to "analyze your use of the site" and "share this information with advertisers or use it to better understand your interests." In reliance on these representations and promises, only then did Plaintiff continue browsing the Websites.

122.    Even before the popup cookie consent banner appeared on the screen, Defendants nonetheless caused cookies and tracking technologies, including those used for functional and advertising purposes, to be placed on Plaintiff Bonkowski's device and/or transmitted to the Third Parties along with user data, without Plaintiff Bonkowski's knowledge. Accordingly, Defendants' representation made on the popup cookie consent banner and cookies preference window to Plaintiff Bonkowski, that he could reject the use and/or placement of all non-required cookies and tracking technologies while he browsed the Websites, were false. Contrary to what Defendants made Plaintiff Bonkowski believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendants had already caused that to happen.

123.    Then, as Plaintiff Bonkowski continued to browse the Websites in reliance on the promises Defendants made in the cookie consent banner, and despite Plaintiff Bonkowski's

CLASS ACTION COMPLAINT

clear rejection of the use and/or placement of such cookies and tracking technologies, Defendants nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing analytics and advertising functions from the Third Parties on his device. In doing so, Defendants permitted the Third Parties to track and collect Plaintiff Bonkowski's Private Communications as Plaintiff Bonkowski browsed the Websites.

124.    Defendants' representation that consumers could "choose" which cookies and related tracking technologies would be used while Plaintiff Bonkowski and users browsed the Websites were untrue. Had Plaintiff Bonkowski known this fact, he would not have used the Websites. Moreover, Plaintiff Bonkowski reviewed the popup cookie consent banner and cookies preference window prior to using the Websites. Had Defendants disclosed that they would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all non-required cookies, Plaintiff Bonkowski would have noticed it and would not have used the Websites or, at a minimum, he would have interacted with the Websites differently.

125.    Plaintiff Bonkowski continues to desire to browse content featured on the Websites. Plaintiff Bonkowski would like to browse websites that do not misrepresent that users can reject all non-required cookies and tracking technologies. If the Websites were programmed to honor users' requests to reject all non-required cookies and tracking technologies, Plaintiff Bonkowski would likely browse the Websites again in the future, but will not do so until then. Plaintiff Bonkowski regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Bonkowski does not know how the Websites are programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Websites honor users' requests to reject all non-required cookies and tracking technologies, Plaintiff Bonkowski will be unable to rely on Defendants' representation when browsing the Websites in the future absent an injunction that prohibits Defendants from making misrepresentation on the Websites. The only way to determine what network traffic is sent to

third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Bonkowski is not a software developer and has not received training with respect to HTTP network calls.

**Itaty Hernandez**

126.    Plaintiff Hernandez visited the gatorade.com Website to browse information about Defendants' products on one or more occasions during the last four years. Plaintiff Hernandez's visits to the Website were consistent with a typical Website user's visits seeking information about Gatorade. Specifically, Plaintiff Hernandez is not a consumer advocate, a "tester," or a compliance auditor that visited Defendant's website to test or evaluate Defendant's privacy practices.

127.    When Plaintiff Hernandez visited the Gatorade Website, the Website immediately presented her with Defendants' popup cookie consent banner, which provided the option to click or select the "Manage Cookie Preferences" button. Plaintiff Hernandez viewed Defendants' representation on the popup cookie consent banner that, "Your privacy is important to us[.] This website uses cookies so that we can provide you with the best user experience. To learn more and to change your cookie settings, click 'Manage Cookie Preferences.'"

128.    Consistent with her typical practice in managing her website cookie preferences to reject or otherwise decline the placement or use of cookies and tracking technologies, Plaintiff Hernandez selected and clicked the "Manage Cookie Preferences" button. Clicking this button directed Plaintiff Hernandez to the cookies preference window, where Plaintiff Hernandez viewed Defendants' further representation and invitation to "choose whether this site may use cookies or related technologies such as web beacons, pixel tags, and flash objects ('Cookies') as described below." Plaintiff Hernandez also viewed Defendants' description of each category of Required Cookies, Functional Cookies, and Advertising Cookies. Desiring to reject or decline all cookies, or at least as many cookies as possible, especially those used for

analytics and advertising, Plaintiff Hernandez selected or clicked the "NO" option or setting for all categories of cookies for which she could do so, including Functional Cookies and Advertising Cookies. The only category of cookies she could not reject or decline were "Required Cookies…necessary to enable the basic features of this site to function[.]"

129.    Plaintiff Hernandez believed that selecting the "NO" option or setting for all categories of cookies, except Required Cookies, on the cookies preference window found on the Website would allow her to opt out of, decline, and/or reject all non-required cookies and other tracking technologies (inclusive of those cookies that performed analytics and advertising functions). Plaintiff Hernandez then clicked or selected the "SUBMIT PREFERENCES" button to notify Defendants of her choices.

130.    In rejecting all non-required cookies in the cookies preference window, Plaintiff Hernandez gave Defendants notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Hernandez specifically rejected, based on Defendants' representations, those cookies used to "analyze your use of the site" and "share this information with advertisers or use it to better understand your interests." In reliance on these representations and promises, only then did Plaintiff Hernandez continue browsing the Website.

131.    Even before the popup cookie consent banner appeared on the screen, Defendants nonetheless caused cookies and tracking technologies, including those used for functional and advertising purposes, to be placed on Plaintiff Hernandez's device and/or transmitted to the Third Parties along with user data, without Plaintiff Hernandez's knowledge. Accordingly, Defendants' representations made on the popup cookie consent banner and cookies preference window to Plaintiff Hernandez, that she could reject the use and/or placement of all non-required cookies and tracking technologies while she browsed the Website, were false. Contrary to what Defendants made Plaintiff Hernandez believe, she did not have a choice about whether third-party cookies would be placed on her device and/or

transmitted to the Third Parties along with her user data; rather, Defendants had already caused that to happen.

132.    Then, as Plaintiff Hernandez continued to browse the Website in reliance on the promises Defendants made in the cookie consent banner, and despite Plaintiff Hernandez's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendants nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing analytics and advertising functions from the Third Parties on her device. In doing so, Defendants permitted the Third Parties to track and collect Plaintiff Hernandez's Private Communications as Plaintiff Hernandez browsed the Website.

133.    Defendants' representations that consumers could "choose" which cookies and related tracking technologies would be used while Plaintiff Hernandez and users browsed the Websites were untrue. Had Plaintiff Hernandez known this fact, she would not have used the Websites. Moreover, Plaintiff Hernandez reviewed the popup cookie consent banner and cookies preference window prior to using the Website. Had Defendants disclosed that they would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all non-required cookies, Plaintiff Hernandez would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

134.    Plaintiff Hernandez continues to desire to browse content featured on the Websites. Plaintiff Hernandez would like to browse websites that do not misrepresent that users can reject all non-required cookies and tracking technologies. If the Websites were programmed to honor users' requests to reject all non-required cookies and tracking technologies, Plaintiff Hernandez would likely browse the Websites again in the future, but will not do so until then. Plaintiff Hernandez regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Hernandez does not know how the Websites are programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Websites honor users' requests to reject all non-required cookies and tracking

technologies, Plaintiff Hernandez will be unable to rely on Defendants' representation when browsing the Websites in the future absent an injunction that prohibits Defendants from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Hernandez is not a software developer and has not received training with respect to HTTP network calls.

### CLASS ALLEGATIONS

135.    Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

**Class**: All persons who, while in the State of California, browsed any of the Websites after clicking or selecting the "Manage Cookie Preferences" button in the popup cookies consent banner, then selected the "NO" options or settings for Functional and Advertising cookies on the cookies preference window, from August 15, 2021 to the present (the "Class Period").

136.    This action has been brought and may properly be maintained as a class action against Defendants because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

137.    **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

138.    **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful

conduct that led them to believe that Defendants would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to reject all non-required cookies and tracking technologies on the Websites, nor would Defendants permit third parties to track and collect Class members' Private Communications as Class members browsed the Websites.

139.    The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a.    Whether Defendants' actions violate California laws invoked herein; and

b.    Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

140.    **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Websites, rejected non-required cookies, and had their confidential Private Communications intercepted by the Third Parties.

141.    **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendants' liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and

are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

142.    **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## **CAUSES OF ACTION**

### **First Cause of Action: Invasion of Privacy**

143.    Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

144.    To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendants constituting a serious invasion of privacy.

145.    Defendants have intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the

knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

146.    Plaintiffs and Class members have a reasonable expectation of privacy under the circumstances, as Defendants affirmatively promised users they could manage their preferences to reject non-required cookies and that they "choose" whether the Websites used cookies and related tracking technologies before proceeding to browse the Websites. Plaintiffs and other Class members directed their electronic devices to access the Websites and, when presented with the popup cookies consent banner and cookies preference window on the Websites, Plaintiffs and Class members rejected non-required cookies and reasonably expected that their rejection of non-required cookies and tracking technologies would be honored. That is, Plaintiffs and Class members reasonably believed that Defendants would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Websites. Plaintiffs and Class members also reasonably expected that, if they rejected such cookies and/or tracking technologies, Defendants would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Websites.

147.    Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

148.    Defendants, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permit the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information,

CLASS ACTION COMPLAINT

referring URLs, session information, user identifiers, and/or geolocation data. The data that Defendants caused the third parties to collect enables the Third Parties to, *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as millennials, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

149.    Defendants' actions constituted a serious invasion of privacy in that they invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

150.    Defendants' intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

151.    Defendants lack a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

152.    Plaintiffs and Class members have been damaged by Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

153.    Plaintiffs and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as

well as disgorgement of profits made by Defendants as a result of their intrusions upon Plaintiffs' and Class members' privacy.

154.    Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Websites' use of non-required cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**<u>Second Cause of Action</u>: Intrusion Upon Seclusion**

155.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

156.    To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendants intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

157.    By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendants' representation otherwise in the popup cookie consent banner, Defendants intentionally intruded upon the solitude or seclusion of the Websites' users. Defendants effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

158.    The Third Parties' tracking and collecting of Plaintiffs and Class member's Private Communications on the Websites using third-party cookies that Defendants caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those users of the Websites specifically chose to decline or reject all non-required cookies.

159.     Plaintiffs and the Class members have an objectively reasonable expectation of privacy surrounding their Private Communications on the Websites based on Defendants' promise that users could manage their preferences to reject non-required cookies and that they "choose" whether the Websites used cookies, as well as state criminal and civil laws designed to protect individual privacy.

160.     Defendants intentional intrusion into Plaintiffs and other users' Private Communications would be highly offensive to a reasonable person given that Defendants represented that the Websites' users could manage their preferences to reject non-required cookies and that they "choose" whether the Websites used cookies when, in fact, Defendants caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers rejected all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendants' false representation, that when Plaintiffs and Class members rejected all non-required cookies and related tracking technologies, Defendants would not cause such third-party cookies to be stored on Plaintiffs' and Class members' devices or permit the Third Parties to obtain their Private Communications on the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

161.     Defendants' conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Websites.

162.     Plaintiffs and Class members have been damaged by Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

163.     Plaintiffs and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendants as a result of their intrusions upon Plaintiffs and Class members' privacy.

164.    Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs and Class members' rights and Plaintiffs and Class members' rejection of the Websites' use of non-required cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

### **Third Cause of Action**: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)

165.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

166.    California Penal Code § 631(a) provides, in pertinent part:

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

167.    The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

168.    Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis supplied; internal citations omitted).

169.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under § 631(a), Plaintiffs need only establish that Defendants, "by means of any machine, instrument, contrivance, or in any other manner," did ***any*** of the following:

> [i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;

> [ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;

> [iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Cal. Penal Code § 631(a).

170.    CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

171.    Defendants are each a "person" within the meaning of California Penal Code § 631.

172.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

173.    The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if

they do not, Defendants' deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

174.    Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendants, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

175.    Under § 631(a), Defendants must show they had the consent of all parties to a communication.

176.    At all relevant times, the Websites caused Plaintiffs' and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Websites in this manner, Defendants willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

177.    At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendants, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

1

2   178.   The Private Communications of Plaintiffs and Class members, on the one hand,

3   and Defendants, on the other, that the Third Parties automatically intercepted directly

4   communicates a Website user's affirmative decisions, actions, choices, preferences, and

5   activities, which constitute the "contents" of electronic communications, including their

6   browsing history, visit history, website interactions, user input data including search terms

7   entered on the Website, demographic information, interests and preferences, shopping

8   behaviors, device information, referring URLs which may contain user input search terms,

9   session information, user identifiers, and/or geolocation data.

10   179.   At all relevant times, the Third Parties used or attempted to use the Private

11   Communications automatically intercepted by their cookie tracking technologies for their own

12   purposes.

13   180.   Plaintiffs and Class members did not provide their prior consent to the Third

14   Parties' intentional access, interception, reading, learning, recording, collection, and usage of

15   Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class

16   members provide their prior consent to Defendants aiding, agreeing with, employing,

17   permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and

18   Class members expressly declined to allow Third Parties' cookies and tracking technologies to

19   access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic

20   communications by choosing to reject non-required cookies in the cookies preference window.

21   181.   The wiretapping of Plaintiffs and Class members occurred in California, where

22   Plaintiffs and Class members accessed the Websites and where the Third Parties—as caused by

23   Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties'

24   servers. Among other things, the cookies, as well as the software code responsible for placing

25   the cookies and transmitting them and other Private Communications to the Third Parties,

26   resided on Plaintiffs' California-located device. In particular, the user's California-based

27   device, after downloading the software code from the Third Parties' servers, (i) stored the code

28

CLASS ACTION COMPLAINT

onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

182.    Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

183.    Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendants' violations of CIPA § 631(a), as well as injunctive relief.

184.    Unless enjoined, Defendants will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants.  Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to snack food and beverage products. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their request to reject non-required cookies and tracking technologies will be honored and/or whether Defendants will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants. Further, Defendants have already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants and will continue to do so unless and until enjoined.

### Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)

185.    Plaintiffs realleges and incorporates by reference all paragraphs alleged herein.

186.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

187.    California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

188.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

189.    The Third Parties' cookies and the corresponding software code installed by Defendants on the Websites are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

190.    At all relevant times, Defendants caused the Third Parties' cookies and the corresponding software code—which are pen registers—to be placed on Plaintiffs' and Class members' browsers and devices, and/or to be used to transmit Plaintiffs' and Class members' IP address and user-agent information. *See Greenley v. Kochava,* 2023 WL 4833466, at *15-16 (S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5-11 (N.D. Cal. Oct. 21, 2024).

191.    Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Websites. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014). ("IP addresses constitute

addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

192.    Plaintiffs and Class members did not provide their prior consent to Defendants' use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendants that they did not consent to the Websites' use of third-party cookies by choosing the "NO" option or setting on the cookies preference window for all non-required cookies in use on the Websites.

193.    Defendants did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

194.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

195.    Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendants' violations of § 638.51(a).

**Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation**

196.    Plaintiffs realleges and incorporates by reference all paragraphs alleged herein.

197.    Defendants fraudulently and deceptively informed Plaintiffs and Class members that they could "choose" to decline or reject non-required cookies.

198.    However, despite Defendants' representation otherwise, Defendants caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users clicked or selected the "NO" options or settings for all non-required cookies in the cookies preference window. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to decline or reject all such cookies.

199.    These misrepresentations and omissions were known exclusively to, and actively concealed by Defendants, not reasonably known to Plaintiffs and Class members, and material

at the time they were made. Defendants knew, or should have known, how the Websites functioned, including the Third Party's resources they installed on the Websites and the third-party cookies in use on the Websites, through testing the Websites, evaluating their performance metrics by means of their accounts with the Third Parties, or otherwise, and knew, or should have known, that the Websites' programming allowed the third-party cookies to be placed on users'—including Plaintiffs'—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users attempted to decline or reject all non-required cookies, which Defendants promised their users they could do. Defendants' misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Websites. In misleading Plaintiffs and Class members and not so informing them, Defendants breached their duties to Plaintiffs and Class members. Defendants also gained financially from, and as a result of, their breaches.

200.    Plaintiffs and Class members relied to their detriment on Defendants' misrepresentations and fraudulent omissions.

201.    Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendants' unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

202.    Defendants' actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

203. Defendants' representation that consumers could manage their preferences to reject non-required cookies and that they "choose" which cookies and related technologies would be used on the Websites (including those that "analyze your use of the site" and "share this information with advertisers or use it to better understand your interests") if they clicked or selected the "NO" options or settings for all categories of non-required cookies was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Websites. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner and cookies preference window prior to their interactions with the Websites. Had Defendants disclosed that they caused third-party non-required cookies to be stored on Website visitors' devices that are related to analytics and advertising functions and/or share information with third parties even after they choose to reject all such non-required cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Websites.

204. By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendants fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Websites under the mistaken belief that Defendants would not permit third parties to obtain users' Private Communications when consumers chose to reject non-required cookies. As a result, Plaintiffs and the Class members provided more personal data than they would have otherwise.

205. Plaintiffs and Class members justifiably and reasonably relied on Defendants' misrepresentations and omissions, and, accordingly, were damaged by Defendants' conduct.

206. As a direct and proximate result of Defendants' misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

207. Plaintiffs and Class members seek punitive damages because Defendants, actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and

Plaintiffs' and Class members' rejection of the Websites' use of non-required cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

### **Sixth Cause of Action**: Unjust Enrichment

208.    Plaintiffs realleges and incorporates by reference all paragraphs alleged herein.

209.    Defendants created and implemented a scheme to increase their own profits through a pervasive pattern of false statements and fraudulent omissions.

210.    Defendants was unjustly enriched as a result of their wrongful conduct, including through their misrepresentation that users could "choose" which cookies and related technologies would be used on the Websites and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members rejected all such cookies.

211.    Plaintiffs' and Class members' Private Communications have conferred an economic benefit on Defendants.

212.    Defendants have been unjustly enriched at the expense of Plaintiffs and Class members, and Defendants has unjustly retained the benefits of unlawful and wrongful conduct.

213.    Defendants appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendants at  their detriment. These benefits were the expected result of Defendants acting in pecuniary interest at the expense of Plaintiffs and Class members.

214.    It would be unjust for Defendants to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

215.    There is no justification for Defendants enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of wrongful conduct.

216.    Plaintiffs and Class members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position  they occupied prior to having their Private Communications tracked and collected by the Third Parties.

217.    Plaintiffs pleads this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

<u>**Seventh Cause of Action**</u>: **Trespass to Chattels**

218.    Plaintiffs realleges and incorporates by reference all paragraphs alleged herein.

219.    Defendants, intentionally and without consent or other legal justification, caused cookies to be stored on Plaintiffs' and Class members' browsers and devices, which caused the Third Parties and Defendants to track and collect Plaintiffs' and Class members' Private Communications and use the data collected for their own advantage, as described above.

220.    Defendants was unjustly enriched as a result of wrongful conduct, including through misrepresentations that users could reject all non-required cookies and related tracking technologies, and through their failure to disclose that Defendants caused third-party cookies to be stored on consumers' devices and browsers, which cause the Third Parties and Defendants to track and collect Plaintiffs' and Class members' Private Communications even after consumers chose to reject all such cookies.

221.    Defendants intentionally caused third party software code to be stored onto Plaintiffs' and Class members' devices, knowing that the code would be executed by those devices. The software code then placed and/or transmitted cookies along with Plaintiffs' and Class members' Private Communications to the Third Parties. These intentional acts interfered with Plaintiffs' and Class members' use of the following personal property owned, leased, or controlled by Plaintiffs and other users: (a) Plaintiffs' and Class members' computers and other electronic devices; and (b) Plaintiffs' and Class members' personally identifiable information.

222.    Defendants' trespass of Plaintiffs' and other users' computing devices resulted in harm to Plaintiffs and other users and caused Plaintiffs and other users the following damages:

a.    Nominal damages for trespass;

b.    Reduction of storage, disk space, and performance of Plaintiffs' and other users' computing devices; and

c.    Loss of value of Plaintiffs' and other users' computing devices.

## PRAYER FOR RELIEF

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully requests judgment against Defendants as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B.    An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendants for all damages sustained as a result of Defendants' wrongdoing, including both pre- and post-judgment interest thereon;

C.    An award of punitive damages;

D.    An award of nominal damages;

E.    An order for full restitution;

F.    An order requiring Defendants to disgorge revenues and profits wrongfully obtained;

G.    An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H.    For reasonable attorneys' fees and the costs of suit incurred; and

I.    For such further relief as may be just and proper.

Dated: August 15, 2025

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GUTRIDE SAFIER LLP**

*/s/Seth Safier/s/*_____
 Seth A. Safier (State Bar No. 197427)
   seth@gutridesafier.com
 Marie A. McCrary (State Bar No. 262670)
   marie@gutridesafier.com
 Todd Kennedy (State Bar No. 250267)
   todd@gutridesafier.com
 Kali R. Backer (State Bar No. 342492)
   kali@gutridesafier.com
 100 Pine Street, Suite 1250
 San Francisco, CA 94111
 Telephone: (415) 639-9090
 Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT